Argued November 20, 1945; modified June 25; rehearing
denied September 10, 1946

# PUBLIC MARKET CO. OF PORTLAND *v.*
# CITY OF PORTLAND ET AL.
### (170 P. (2d) 586)

James W. Crawford, Judge.

*Lyman E. Latourette,* City Attorney, and *Jay Bowerman,* both of Portland (with John F. Reilly, of Portland, on brief), for defendant-appellant and cross-respondent.

*Charles A. Hart* and *Prescott W. Cookingham,* both of Portland (Hart, Spencer, McCulloch & Rockwood and Cookingham & Hanley on brief), for plaintiff-respondent and cross-appellant.

*Edgar Freed* and *George R. Wilbur,* both of Portland, for defendants-respondents and cross- appellants.

LUSK, J.

This case, involving the rights of the plaintiff, Public Market Company of Portland, under a contract by which it agreed to construct a public market building for the City of Portland and to deliver it to the City upon completion, is here for the third time. (For former opinions, see 160 Or. 155, 83 P. (2d) 440; 171 Or. 522, 130 P. (2d) 624, 138 P. (2d) 916.)

Upon the last appeal, taken by the plaintiff from a decree of dismissal, we held that the contract which the plaintiff was then seeking to have specifically performed was not a general obligation contract of the City of Portland, but that the parties intended that the agreed purchase price was to be paid from the proceeds of the sale of public utility certificates theretofore authorized by the City. We held that the plaintiff had fully performed the contract on its part; that the City had wrongfully repudiated the contract; and that the plaintiff was entitled to relief by way of damages if the proofs should show that it had suffered damage. We said:

"The Market Company, therefore, is entitled to recover the difference, if any, between the contract price and the reasonable market value of the land, building and equipment at the time of the breach." (171 Or. 591)

We reversed the decree and remanded the cause to the Circuit Court for the purpose of determining damages in accordance with that measure. On petition for rehearing, filed by the plaintiff, we held that any award

of damages should carry interest from the date of the breach.

Upon the remand the plaintiff filed an amended complaint alleging that the reasonable market value of the property involved on the date of the breach, November 14, 1934, was not in excess of $550,000.00, and praying for a judgment against the City in the amount of the difference between that sum and the amount which, upon an accounting, should be found to be the full purchase price agreed to be paid by the City. The City filed an amended answer setting up various affirmative matters. After a trial the court, on August 1, 1944, entered its decree by which it found that the total purchase price was $1,463,943.96, and the market value of the property on November 14, 1934, was $963,943.96, and accordingly gave judgment against the City for $500,000.00 and the further sum of $291,666.67 as interest upon said damage award at the rate of six per cent per annum from November 14, 1934, to the date of the decree, a total of $791,666.67. From that judgment the defendant City of Portland has appealed, and the plaintiff Public Market Company of Portland, and the defendants Reconstruction Finance Corporation and The First National Bank of Portland (Oregon) have cross-appealed.

The first question for decision arises upon the contention of the City that the Circuit Court erred in confining the issues to the single question of damages according to the measure stated in our opinion in 171 Or. It is said that the true measure of damages is the difference between the value of the property and the amount in money which could have been obtained from a sale of the public utility certificates. It is argued that what we said on this subject in our former opinion was

not intended to establish the law of the case, and that in any event it was not conclusive upon the trial judge or upon this court now for the following reasons: (1) because this court is a court of review and we had no authority to decide matters which were not litigated and decided at the previous trial; (2) that the reversal of the former decree and a trial upon the question of damages involves new issues and new evidence and different legal principles; (3) that the doctrine in question does not apply to matters that might have been previously litigated but which were not; and (4) that if the doctrine should now be applied the City would be deprived of due process of law in violation of the Fourteenth Amendment of the Federal Constitution and Art. I, § 10, of the Constitution of Oregon, and would be denied its day in court.

The doctrine of "the law of the case" was thus expounded by this court, speaking through Mr. Justice WOLVERTON, in *Stager v. Troy Laundry Co.*, 41 Or. 141, 142, 68 P. 405:

"The rule has long been established, and is uniformly adhered to, that an appellate court will not revise or reverse its former decisions made in the same cause, and upon the same state of facts, and this for two reasons: (1) They stand as precedents and authority, as if made in any other case upon a like state of facts; and (2) as adjudications between the same parties. The policy of the law and the practical administration of justice require that there should be an end of litigation, and the rule has grown up to meet this requirement. If parties were permitted to present the same issues in the same case as often as they feel aggrieved by the result, litigation would descend into a contest for perseverance and persistence, rather than of legal rights, and it could not be brought to a determination so long as human ingenuity could prevent it."

See *Shaver Forwarding Co. v. Eagle Star Insurance Co.*, 177 Or. 410, 162 P. (2d) 789, 790, and Oregon cases there cited.

■ As to the first of the above-enumerated contentions of the City we think it necessary only to refer to pages 587 to 592 of 171 Or., where the question of plaintiff's remedy is discussed. It will appear that the views there stated were expressed deliberately and with the purpose to provide a guide and rule of decision to the Circuit Court and to counsel for the litigants in future proceedings.

■ The other contentions are, we think, equally without merit. On the first appeal (the question arising on demurrer to the complaint) we construed the contract as one imposing a general obligation on the City, but, in view of certain ambiguities in the contract, left the way open for the adoption of a different construction after a trial upon the merits. (160 Or. 180) Such a trial was had, and the Circuit Court ruled that the contract was one for a special obligation and that the suit should be dismissed. The plaintiff then urged upon the court that, even so, it was entitled to a remedy if it had fully performed the contract and the City had wrongfully repudiated it. The court then reopened the case, and, after the taking of further testimony, held that the plaintiff had not fully performed; that, therefore, it was unnecessary to consider the question of plaintiff's remedy, and dismissed the suit.

As stated, we reversed that decree. We concurred in the Circuit Court's construction of the nature of the obligation imposed on the City by the terms of the contract. But we decided that the plaintiff had fully performed the contract and the City had breached it, a conclusion in which all the members of this court con-

curred (see dissenting opinion of Mr. Justice RAND, 171 Or. 597). We were then faced with the question of what further disposition to make of the case. The plaintiff urged the application of the rule of the local improvement cases. The City contended that the question was not before us because the complaint stated a cause of suit for specific performance and not for damages. But it pointed to opinion evidence introduced by it at the trial tending to show that the utility certificates could not have been sold for an adequate price, and argued that in any event an amendment to the pleadings would be futile for the reason, among others, that "even if the plaintiff had fully performed its obligations and still the fund (from the sale of utility certificates) was lacking through some conditions not showing negligence attributable to the city there would be no right of recovery against the City".

To this contention we said:

"Based on some evidence in the record, the City has urged that in no circumstances is the plaintiff entitled to relief because it would not have been possible to sell an issue of public market utility certificates at the time that the City should have performed its contract. It did not put its repudiation of the contract on that ground, and the proper way in which to have determined that question was by a good faith effort to make the sale. Denny v. Campbell's Ex'r, supra." (171 Or. 592)

We further said:

"The controlling principle here is the same as that which lies at the root of the local improvement cases in this state, which hold that a city will not be permitted to escape liability on a contract for work performed, by neglecting to levy an assessment in order to create the fund to which the contractor has

agreed to look for payment of the contract price."
(171 Or. 589)

We deem it proper to add that, as we said in the opinion on the former appeal, counsel for the City, on the argument and at one point in their brief, conceded the applicability of the rule of the local improvement cases, though elsewhere contesting it. (171 Or. 590) That concession in the brief was made in the course of an argument in answer to the plaintiff's contention that the contract created a general obligation and is as follows:

"It is not true that the city was 'free to defer indefinitely the creation of the fund.' The city's officers had a definite duty to perform under penalty of suffering a general obligation liability against the city. This duty was to act with a reasonable degree of diligence in the manner of selling the certificates and creating the fund, just as in the case of street improvements to be paid for by a special fund to be raised by an assessment against the property benefited. The city's officers have the duty to act with reasonable diligence in the matter of making a valid assessment, and, if possible, selling the property if the owners fail to pay."

We are now called upon by the City to recede from our former deliberate decision and to declare that what was then said to be the law of this case is not the law. In effect, we are asked to dismiss the suit for reasons which were then held not valid. Were we now in fact dealing with a pronouncement made in another case, the correctness of which was being called in question, we should not hesitate to re-examine the question when urged to do so with the earnestness and ability which characterize the brief of counsel for the City. But this has been but one case from the beginning. The law

applicable to it was established in our former opinion and could not be set aside without ignoring a rule firmly imbedded in the jurisprudence of this country and consistently adhered to by this court.

■ ■ The claim that this court exercised original jurisdiction in announcing the measure of damages is, in our opinion, untenable. Here was a case which had been fully tried upon the issues of the construction of the contract, performance by the plaintiff, and repudiation by the City. The record then made consisted of more than 1,000 pages, and explored every phase of the controversy except the accounting and the value of the property. The question of the remedy available to the plaintiff for breach of the contract by the City was presented to the trial judge after he had held that it was a special obligation contract. It is true he did not pass on the question, but that was only because he took the view, which we later found erroneous, that the plaintiff had not fully performed. The question was there before him, and, had he decided that the plaintiff had fully performed, it would have been his duty to proceed and determine the available remedy. But his failure to do so did not preclude this court from making that determination. This is a suit in equity in which the court tries the case *de novo* (§ 10-810, O.C.L.A.). The facts showed that the plaintiff was entitled to a remedy, and the question of the nature of that remedy was squarely presented by the record. It is true that we were unable to enter a final decree because there was no evidence in the record as to the full amount of the purchase price and the value of the property involved. But, in our opinion, it was no more an exercise of original jurisdiction for us to determine and declare the rule of damages to be applied than it was

for us to decide that the plaintiff was entitled to an accounting for the purpose of ascertaining the amount of the purchase price. Had we shrunk from the performance of our duty then, the court below might have adopted a rule of damages and a method of procedure which, if contrary to our view of the law, would have necessitated another reversal and another trial. No authorities have been cited by the City which support such a limitation upon the powers and functions of this court in a situation of that kind. And we doubt if any can be found.

As to the claim that new evidence and different legal principles have come into the case since the last reversal, it is sufficient to say that there is no evidence of a different character than that which was before us on the former appeal, although there is some new evidence that is cumulative of the old; and that what is urged as the application of new legal principles comes down at the last to a challenge of the rule of damages which we announced, or an attempt in a different guise to show that the plaintiff did not fully perform, notwithstanding that we have held to the contrary.

■ We must, therefore, decline to inquire again into the question of the nature of the relief to which the plaintiff is entitled. And, since that question was fully presented on the former appeal, in the briefs and on the argument, and counsel for the City had ample opportunity to be heard upon it and were heard, there is no merit in the suggestion that the requirements of due process of law have not been met.

The City contends that the plaintiff prevented, or substantially interfered with, the contractual duty of the City to provide the fund by the issuance and sale of public utility certificates, and thereby forfeited the

right to recover damages. The particulars of this charge are these:

■ It is said, first, that plaintiff failed to make a proper tender of a conveyance to the property in that each of the tenders was coupled with a provision that the City should pay the full amount in cash, and that the title papers would not be delivered until such payment was made. Thus, it is argued, the City was prevented from giving a mortgage in order to secure the utility certificates and from issuing or offering the certificates for sale. Substantially the same issue was raised by pleading and argument on the former appeal, and, although it was not specifically mentioned, it was necessarily decided adversely to the City. As stated in the opinion, there were two tenders. The first was rejected because made "by strangers to the record"; the second was met by a flat repudiation of the contract and of any obligation under it whatever. (171 Or. 583, 584) The tender conformed strictly to the provisions of Paragraph 6 of the contract (set out at 171 Or. 534), and, even though it could be said to be defective for the reasons assigned by counsel, the defect was waived by the City's repudiation of the contract. 58 C. J., Specific Performance, 1080, § 340; *Corbus v. Teed,* 69 Ill. 205; *McWhorter v. McMahan,* 10 Paige (N. Y.) 386.

■ It is next asserted, as it was on the former appeal that the plaintiff disregarded the provisions in the contract (see 171 Or. 533) that the building operation should be commenced within fifteen days after the City should have procured the approving opinion of legal counsel of the authority of the City to issue and sell the public utility certificates. Again the contention is foreclosed by our former opinion. As we did not then comment on it specifically, it may be well to state what the record shows in this regard. On March 22,

1933, the City Council adopted a resolution which, after reciting delays in the commencement of construction of the market building, directed that the plaintiff be notified to appear before the Council at its next regular meeting and show cause why the contract should not be canceled. Thereafter a representative of the plaintiff appeared before the Council and explained the reason for the delay, and it was ordered that the resolution be given no further consideration. The action of the City, of course, waived the delay, and, since the City was insisting that the plaintiff proceed with the construction of the building, although it knew that the legal opinion in question had not been procured, it likewise waived that requirement.

It is said further that the plaintiff failed to adjust the time of opening the market to the time of building completion; that it failed to communicate promptly to the City Council the exact nature and extent of equipment and supplies purchased by it and to secure the approval of the Council; that it failed to present promptly to the City Council for its approval building alterations which the company desired and proceeded to make without Council approval; that it failed to give full information to the Council about leases which it made at the time that they were made; and that it failed to communicate to the Council facts concerning the income which such leases would give the market property, and that the information in that regard which it did give was incorrect, concealed on its books, and indicated a higher income than was the fact; and that it delayed several months after completion of the building before tendering a conveyance.

■ These contentions are not urged—avowedly at least—as showing that the plaintiff did not fully per-

form the contract on its part. The City apparently recognizes that that question is no longer open, but the alleged shortcomings of the plaintiff apparently are thought to occupy some middle ground, not amounting to a breach of contract, but sufficiently serious to avoid the claim for damages. Whatever the legal theory may be, the fact is, in our opinion, that no act of the plaintiff was in the slightest degree responsible for the City's failure to issue the public utility certificates.

It is implicit in the record that long before the City repudiated the contract it cooled toward the market project, not because the plaintiff did not live up to its obligations, but for other reasons. The City at no time took any steps toward launching an issue of public utility certificates. The market building was so far completed as to permit of its opening and the commencement of market operations on December 15, 1933, although it was not fully completed until April, 1934. During that period a representative of the City was attached to the market to get acquainted with the business. There is nothing to indicate that the City gave any consideration whatever to the matter of the issue of public utility certificates until April, 1934. On April 18 the City Council received a telegram from the Reconstruction Finance Corporation calling attention to the Corporation's interest in the market project by reason of its loan in the sum of $775,000.00, and to the fact that the building was completed and the market operating, and concluding: ''Will you please advise us steps you have taken for financing purchase of market under contract and your future plans with regard thereto?'' The telegram was never answered. It was referred to the city attorney with a request for an opinion as to various phases of the contract and the

City's obligations thereunder, including the question whether "the City is compelled to take any action in the premises unless and until the City is fully advised that it can market utility certificates to carry out the contract in case we find the City is so obligated." The only opinion by the city attorney in response to this request was rendered by him, June 11, 1934, after the City had received the tender of a conveyance of the market property from the Security Savings & Trust Company and the Reconstruction Finance Corporation. His advice was to reject the tender because, as has been said, it was made by "strangers to the record". He concluded:

"Under the provisions of the plans and specifications and the contract there are certain acts that the Public Market Company of Portland must perform before the Public Market Company of Portland can even make a tender to the City of the market building. These are matters which should be discussed with the Public Market Company of Portland only. Therefore, so far as Calendar Matter #2063 and 3047-1 are concerned, the city attorney recommends that they be given no further consideration by the Council."

Calendar Matter #2063 was the request by the Council for an opinion by the city attorney, prompted by receipt of the telegram from the Reconstruction Finance Corporation. On June 20, 1934, the Council unanimously adopted the recommendation of the city attorney. In other words, the Council at that time decided that it would give no further consideration to the question of its legal liability under the contract, including its duty to provide for the issuance and sale of public utility certificates.

Under date of July 6, 1934, the plaintiff submitted

in writing to the Council a list of materials, equipment and supplies installed in the market building pursuant to the terms of the contract and asked the Council's approval of the purchases, and, by the same communication asked approval of certain leases of space in the market building which had been theretofore delivered to the City. The matter was referred to the City's market committee, which recommended that the communication be placed on file, since "in the light of a previously given opinion of the city attorney the market committee feels that the matters covered by the communication are not properly before the committee." The market committee was composed of two of the city commissioners, the city attorney, and the inspector of buildings. Its report came before the Council at its meeting August 8, 1934, and was unanimously adopted with the amendment "that the documents shall be given no further consideration."

The next official action of the City was the adoption of a resolution rejecting the plaintiff's tender of a conveyance and repudiating the contract on November 14, 1934.

From the foregoing recital it is apparent that the City took the final step without ever having received official advice from its duly constituted legal officer as to whether it was or was not liable under the contract. It is true that the city attorney in his opinion of June 11, 1934, referred to certain acts that "the Public Market Company of Portland must perform before the Public Market Company of Portland can even make a tender to the City of the market building." What those acts were he did not specify, and it is not of record that the Council inquired or was ever informed, at least prior to November 14, 1934. It would be natural to

assume that if the City had or thought it had any just grounds for refusing to perform it would have stated them in the resolution repudiating the contract. But this it did not do.

Reading between the lines of the record made by the City during this period it is difficult to escape the conclusion that it was temporizing. Without advice that there were legal grounds which would justify its refusal to perform, it pursued a policy of "no further consideration" of the important matters which came to the attention of the Council relating to the contract, apparently awaiting an appropriate time to announce its ultimate decision. One commissioner was bitter and vocal in his opposition to carrying out the contract. Another testified on the former hearing that he never intended that the City should take over the market if he could prevent it, while the then mayor testified that in his opinion there was no contract in any way controlling his official action. None of them, it should be said, was a member of the City Council when the contract was entered into. But the personnel of the Council had altered and the climate of opinion as to the desirability and feasibility of a public market had undergone a radical change. The charge now made that it was the conduct of the plaintiff which prevented the issuance and sale of public utility certificates is an afterthought; the truth is that the City's disregard of its duty was the result of its decision that it did not want the market building and did not wish to engage in the market business. We said in our former opinion, in speaking of this very matter, that the City was guilty of "an outright and unwarranted refusal to be bound by its lawful undertaking". (171 Or. 590) Not only is that statement the law of the case, but nothing that has been

called to our attention since it was made furnishes any ground for thinking that it was not just and correct.

There remains for consideration the propriety of the award of damages made by the Circuit Court. As to this the City contends that the award was excessive, both because errors were committed in the allowance of certain items in the accounting, which was necessary in order to ascertain the total purchase price, and because, under the evidence, the court placed too low a valuation on the property.

The agreed purchase price under the contract was $1,244,790.66 plus certain other amounts, such as reimbursement to the plaintiff for various expenditures made by it and certain obligations assumed by the City. The items making up the total purchase price as found by the Circuit Court are as follows:

| | |
|---|---:|
| Basic price | $1,244,790.66 |
| Equipment, materials and supplies | 29,000.00 |
| Commissions on same | 2,900.00 |
| Leasing service compensation | 6,141.64 |
| Taxes | 45,085.03 |
| Interest on taxes paid | 1,698.55 |
| Assessments | 121,779.46 |
| Interest on Assessments | 8,037.45 |
| Prepaid insurance | 4,511.17 |
| Total | $1,463,943.96 |

The accounting was greatly simplified by a stipulation entered into by the parties in which they agreed upon the amounts involved. We take up the City's objections to the foregoing findings.

*(a) Equipment, materials and supplies—$29,000.00.*

■ By Paragraph 6 of the contract it is provided that in addition to the basic price "the City shall also

reimburse the Company in the full amount of the cash advanced and/or liability incurred by the Company in the purchase of the equipment, materials and supplies described in Exhibit 'B', and shall pay to the Company, in addition thereto, ten per cent (10%) of the purchase price of said equipment, materials and supplies to cover the services of the Company in making said purchases.''
In addition to stipulating that the amount advanced under this provision by the plaintiff was $29,000.00, the parties agreed that on November 14, 1934, the value of the equipment, materials and supplies was $21,750.00. The City argues that, because the plaintiff had the benefit of the use of the property from December 15, 1933, when the market opened, to November 14, 1934, when the contract was repudiated, and, as the plaintiff retains the property, this item should be excluded altogether from the purchase price. We think the entire amount was properly included since the value of this property on November 14, 1934, was considered by the Circuit Court in appraising the value of the entire market property. In other words, while $29,000.00 was included in the purchase price, $21,750.00 was offset against it in fixing the value of the market property. The only theory on which the difference between these two sums, $7,250.00, should be eliminated from the purchase price, is that the plaintiff breached the contract by not tendering the property to the City on the date the market was opened. Since, as we have held, the Market Company fully performed, this objection has no merit.

*(b) Commissions on (a)—$2,900.00.*

The correctness of this allowance follows from the decision as to (a).

*(c) Leasing service compensation—$6,141.64.*

■ By Paragraph 8 of the contract the Company agreed to procure tenants for the market building, and it was agreed that "at the time of the transfer of the property hereinabove described, the City shall pay to the Company for said leasing service, in addition to the other payments provided for in this contract, ten per cent (10%) of the gross revenue derived from rental, plus bonuses and premiums, if any, figured on an annual basis, regardless of whether or not the same be reserved on an annual basis, which are reserved to the City under the leases and/or rental arrangements so procured by the Company, if any". In connection with this item the City repeats the objection that the amount should be offset against the purchase price because the plaintiff conducted the business for eleven months prior to the tender and thus got the full benefit of the leases. We think that what we have already said sufficiently answers this contention. We might add, however, that it was the duty of the plaintiff under the contract to establish the market as a "going public market utility" within the meaning of that term as it has been previously construed by this court (171 Or. 579-583), and that it was in fulfillment of that obligation that the market was operated during the eleven months period.

*(d) Taxes—$45,085.03.*

■ Paragraph 3 of the contract provides: "The Company agrees that it will pay all legal taxes, assessments and interest which become due and are payable after November 5, 1931, up to the time that it delivers title to the City, and the City agrees that it will reimburse said Company from funds derived from the sale of Public Market Utility Certificates for all sums which said Company shall pay for such taxes, assess-

ments and interest, with interest at six per cent from the date of said payment or payments." It was stipulated that in 1932 the plaintiff paid the 1931 taxes in two installments totalling $7,894.96, and in 1933 the plaintiff paid the 1932 taxes in two installments totaling $8,081.66; that the 1933 taxes, payable in 1934 in the amount of $8,500.00, and the 1934 taxes payable in 1935 amounting to $20,608.41, have to be paid. The total of these various items is $45,085.03, the amount allowed by the court. The City concedes that the first of the above items for the 1931 taxes was properly included in the purchase price. It objects to the remainder, and argues, first, that the contract contemplated that the building would be completed and turned over to the City within one year from October 28, 1931, the date of the execution of the contract, and, second, that the Company continued in possession of the property during each year when the taxes accrued and thus enjoyed the benefit of government protection for which the taxes were levied. We think that there is no merit in this argument for the reason that the delay was waived by the City, and, since no modification of this provision of the contract was demanded or agreed upon, that it remained in full force and effect. There is no need to repeat what we have said about the contention based on the fact that the plaintiff remained in possession of the property.

(e) *Interest on taxes paid—$1,698.55.*

The propriety of this allowance follows from the allowance of (d).

(f) *Assessments—$121,779.46.*

■ Paragraph 3 of the contract provides that the title to be conveyed by the plaintiff "shall be subject to the unmatured Intercepting Sewer and Drainage

System,: assessments, which the City assumes and agrees to pay out of the revenues from said public market; utility''. The objections to the allowance. of this item are the following: (1) The City agreed to pay the assessments out of the revenues of the market, but the Company operated the market and received the income therefrom. (2) The entire amount of the assessments accrued during the Company's operation and before the tender. Reference is made to the fact that the Company operated the market for nine years after the City's repudiation of the contract, and it is claimed that the operation was inefficient and should have produced a much more substantial income than was the fact. We are of the opinion that the City, by breaching the contract, made it impossible for it to discharge its obligation under the clause here in question and that its liability then became fixed. The character of the operation of the market by the Company after the breach seems to us to be altogether irrelevant, nor are we able to see that the fact that the entire amount of the assessments accrued before the plaintiff made a tender of the conveyance of the property has any bearing on the question.

*(g) Interest on assessments—$8,037.45.*

Since the assessments were properly allowed so likewise was this item of interest.

*(h) Prepaid insurance—$4,511.17.*

The contract provides in Paragraph 7 that the City will pay to the Company all prepaid expenses which the Company has at that time advanced under the terms of its existing contracts. The objection to this item of prepaid insurance is that it made the property worth just that much more at the time of the repudiation of the contract. It was, however, a

proper item to include in ascertaining the total purchase price. By express reference in the decree the amount was added to the value of the property, thus meeting the City's objection.

We conclude that the court's findings and decree as to the agreed purchase price and the items thereof are free from error, and they are therefore sustained.

■ We come now to the question of the value of the property on November 14, 1934, first taking note of a basic contention of the City. It is urged that the evidence of the plaintiff's witnesses should be disregarded altogether because they gave consideration to the unprofitable experience of the Market Company during nine years of operation of the market. As stated in plaintiff's brief, that operation never "earned enough to pay taxes on the property or to pay any part of the money borrowed to finance the construction of the building and the purchase of the equipment." The City says in its brief:

> "It is improper to base a conclusion as to value on the success or failure of a business conducted on the property."

A number of authorities are cited to this proposition, among them Orgel on Valuation under Eminent Domain 536, § 162. The author there is discussing opinion testimony on value based on capitalized earning power, which he indicates should be excluded. But at page 560, § 173, he says:

> "There are times when a consideration of profits is necessary to avoid over-valuation as in the case of old, obsolescent buildings or of new buildings which constitute an over-improvement or an under-improvement of the vacant land."

The City also cites the annotation in 7 A. L. R. 163 on this subject. This annotation is appended to the case of *Gauley & E. Ry. Co. v. Conley,* 84 W. Va. 489, 100 S. E. 290, 7 A. L. R. 157, which is authority for the proposition that evidence of the kind in question is ordinarily inadmissible. The court, however, pointed to an exception to the rule when the property is of peculiar character, and cited the case of *Montgomery v. Schuylkill Bridge Co.,* 110 Pa. 54, 20 Atl. 407, which involved the condemnation of a toll bridge. The court there recognized the exception and permitted the introduction of past annual net profits because the property "was of a peculiar character, and can hardly be said to have a market value."

We are not, of course, dealing with a toll bridge, but we are required to ascertain the value of a special purpose building which is an over-improvement of the vacant land. There is no comparable building in the City of Portland. There are, of course, other buildings well adapted to market operations, but none so exclusively a market building or representing an investment of such magnitude. It was not possible to go to sales of like property for the purpose of determining market value, and, in the sense that such property was commonly bought and sold or ever had been bought and sold, it may be said that it had no market value. The following statement from 1 Nichols on Eminent Domain (2d ed.) 677, 678, cited by the City, is pertinent:

"In such a case as similar property is not commonly bought and sold it is impossible to ascertain market value by the usual tests."

So, in this case most of the witnesses on both sides based their valuations on the capitalization of earning power, and we think that in that process it was proper

to take into consideration the unprofitable nine years of actual experience.

The City makes the particular objection, however, that in its view of the evidence the lack of success of the operation was due to inexperienced and inefficient management. The plaintiff contends on the other hand, and its witnesses so testified, that the market building is too far removed from the shopping center to attract patrons, and this is said to be the principal reason for the market's failure. On this question the City has succeeded in executing a complete about-face since the case was last here. It then said, in support of its claim that the plaintiff had failed to perform because it did not make the property into a "going public utility", that the market was so far away from the shopping district that people would not patronize it, and that the market operation had failed even to pay operating expenses "notwithstanding the prodigous efforts made by the Company to build up patronage". In view of this change of position we have not been greatly impressed with the City's present contention.

There are several elements, in our opinion, which entered into the failure of the market operation. The distance from the shopping center was one, and others were: decentralization of food markets; the City's repudiation of the contract—foreshadowed before its actual occurrence—and the litigation which followed the repudiation and has continued ever since; and, finally, the depression. Of these factors the first two were certainly not the least important. And in any event, there is no convincing evidence that inefficiency in the market operation was the controlling cause, such as would warrant a holding that, in the peculiar circumstances of this case, the witnesses and the court

should shut their eyes to the actual results of the market operation when attempting to determine the value of the property. It is one element entitled to be considered in the appraisal problem.

▪ ██ The parties do not seem to be in serious disagreement as to the ultimate test to be applied. Market value, as this court said in *Pape v. Linn County,* 135 Or. 430, 437, 296 P. 65, "is the amount which the land would bring if it were offered for sale by one who desired but was not obliged to sell and was bought by one who was willing but not obliged to buy." Counsel for the plaintiff, in referring to this and other Oregon cases, say, fairly enough, in their brief:

> "These decisions seem to indicate that a piece of property may have a market value even though it is not immediately salable. Probably any improved property could be sold at any time if the price was low enough, unless perhaps the tax burden was unduly heavy; but all appraisers would agree that the sacrifice price thus established would not represent the fair market value of the property. As to property not commonly bought and sold, the term connotes rather a price which gives both the owner and the buyer a free choice. Both look to the future prospects of the property; and with those prospects in mind, the amount a purchaser might be justified in paying, and which the owner might accept if he decided to sell rather than hold the property, is the fair market value of the property."

We agree with counsel for the City that market value means value under ordinary conditions—not conditions either of depression or inflation. As the court said in *Matter of Board of Water Supply of New York,* 277 N. Y. 452, 458, 14 N. E. (2d) 789, " 'Fair market value' means neither panic value, auction value, speculative value, nor a value fixed by depressed or

inflated prices." See, to the same effect, *Howell v. State Highway Dept.*, 167 S. C. 217, 223, 166 S. E. 129.

The appraisal task is one of exceptional complexity, for not only does it involve all the problems inherent in the endeavor to estimate the value of a building constructed for a special purpose, but beyond that it is necessary to go back to the year 1934 and, looking forward from that time into the future over a period of fifty years—the estimated life of the building—to form a judgment as to the earning power of the property during that period. In view of the nature of the problem, it is, perhaps, not to be wondered at that the experts on real estate values who testified in the case were so far apart in their opinions. The lowest valuation, given by two witnesses for the plaintiff, is $400,-000.00; the highest, given by a witness for the City, is $1,250,000.00, a spread of $850,000.00.

The land on which the building is situated is on the west side of the City of Portland between Front Avenue and the Willamette River. It measures 616 feet along Front Avenue, 189.67 feet on its north line and 208.91 feet on its south line, the area being 107,360 square feet. The portions of Yamhill and Taylor Streets which otherwise would have intersected the property were vacated. The cost of the building was $735,646.36. Its frontage on Front Avenue is the same as the land—606 feet—and in depth it measures 125.80 feet on the north line and 141.12 feet on the south line. The structure is of reinforced concrete, absolutely fireproof; it consists of a basement and four floors, and is a modern market building properly designed and completely equipped to serve that purpose. It was, as one of the witnesses for the City testified, "designed especially for a market building by the finest experts of the country."

The witnesses for the plaintiff thought that the highest and best use of the property in private ownership was not as a market. Their appraisals, as of November 14, 1934, are as follows:

| | |
|---|---:|
| N. C. Soule | $450,000.00 |
| Donald L. Woodward | 500,000.00 |
| Amedee M. Smith | 400,000.00 |
| A. C. Callan | 465,000.00 |
| E. B. MacNaughton | 400,000.00 |

The witnesses for the City took a diametrically opposite view as to the highest and best use of the property, and undertook to show that under competent management a market operation should produce returns which would support the following valuations as of November 14, 1934:

| | |
|---|---:|
| Norman B. Plummer | $1,045,000.00 |
| H. A. Dryer | 1,000,000.00 |
| Irving B. Lincoln | 975,000.00 |
| Coe A. McKenna | 1,250,000.00 |
| Albert L. Bullier | 900,000.00 |

In May of 1929 Mr. Soule, plaintiff's witness, as a member of the appraisal committee of the Portland Realty Board, joined in an appraisal of the vacant land which fixed its value at that time as $390,000.00. In April, 1931, he joined in another such appraisal, valuing the land at $480,000.00. The latter appraisal refers to the fact that the property had been improved with a sea wall and intercepting sewer and that the site had been filled to street level. Both appraisals were made at the request of the plaintiff. Again, in January, 1932, at plaintiff's request, this witness appraised both land and building (upon completion), the former at $500,000.00 and the latter at $861,000.00. To this he added a valuation of $393,000.00 ($47,190.00 net annual return, capitalized at twelve per cent) for the

market business, making a total valuation of $1,754,-000.00. This appraisal assumes private, not municipal, ownership. Mr. Soule's appraisal of the value of the land in 1934 was $250,000.00.

In 1938 the Oregonian Publishing Company considered a long term lease of the property at $60,000.00 a year. Mr. MacNaughton, an officer of the Corporation, testified as a witness for the plaintiff that the idea was abandoned because the foundations of the building were inadequate for the newspaper's heavy presses and because, owing to the location, it was felt that large numbers of people could not be induced to come to listen to the Oregonian's evening radio programs.

In 1943 the plaintiff leased the property to the United States Navy at a gross yearly rental of $84,-500.00. Before entering into the lease the Navy had the property appraised by Mr. Woodward, plaintiff's witness, and Mr. Plummer, witness for the City. At that time the former valued the property at $750,000.00 and the latter at $813,000.00. In connection with the negotiations for this lease Mr. Soule prepared for the plaintiff a statement of the "rental value of space on square foot basis", which he estimated at $142,728.00. Taking the witness' view that the land should earn six per cent per annum and the building eight per cent, the income thus estimated would support a valuation of approximately $1,500,000.00. Mr. Soule explained, however, that this document was given to Mr. Strong, president of the Market Company, "for a guide in bargaining across the table at arms length with the Navy, and I told him that it didn't represent an appraisal of property, and I doubted if he could get the rents therein prescribed."

In addition to expert testimony on value, Mr. Fred Meyer, an operator on an extensive scale of numerous food markets in Portland as well as in other Oregon cities, gave his opinion as a witness for the City that the market could have been operated successfully. He had himself at one time considered establishing a large market on Front Avenue, but decided against it. He said "that the advertising didn't bring them there because they would go to other locations."

It would be an unprofitable task to attempt an analysis of the testimony of the expert witnesses, nor would anything be gained by an examination of their qualifications, which have not been called into question in this court. It is obvious that the wide disparity between the values found by the plaintiff's witnesses, on the one hand, and the City's on the other, is fundamentally due to the fact that the latter thought that a private market operation could have been successfully conducted on the property and the former were of the opposite opinion. In our judgment, the evidence strongly preponderates in favor of the view that, whatever might have been the success of municipal operation—now a matter of pure speculation—, the location of the market on the waterfront, some five or six blocks distant from the City's main shopping center, together with the development of multiple chain store food markets scattered throughout the City and of easy and convenient access to its residence sections, was the decisive factor against the success of the project when it fell into private hands.

In this respect we find ourselves in agreement with the circuit judge, who said in a carefully prepared opinion:

"For general purposes as private property it was unquestionably overbuilt and not addressed to

its location and to the future, considered for other than its original contemplated use as a municipally owned and operated public market.''

It does not follow, however, that we should accept the low valuations of the plaintiff's witnesses and adopt the plaintiff's contention that $550,000.00 is the highest figure warranted by the evidence. The natural partisanship of the expert witness, no matter how honest and well qualified, for the party who calls him, is not to be left out of view, and inconsistency between an expert's opinion given in court and that expressed by him at other times cannot be ignored.

There can be no question about Mr. Soule's qualifications as a real estate appraiser. Of all the witnesses, he had the best and most intimate knowledge of the property involved. His evidence is the most detailed and comprehensive of any who testified for the plaintiff. To some extent it is possible to reconcile his varying appraisals; but, even making allowance for the accelerating effects of the depression, it is difficult to accept a decline of $200,000.00 in the value of the land between 1932 and November, 1934, unless we are to be governed in our estimate of market value by a depression low.

On the other hand, the evidently disinterested appraisals of Mr. Woodward and Mr. Plummer for the Navy in 1943 constitute, it seems to us, important evidence, even though they relate to a time nine years after the date as of which value must be determined. In giving to this evidence its just weight and effect, it must be borne in mind that, while the appraisals were made during the war, when general economic conditions had improved and real estate values had increased,

nine years of the estimated life of the building had gone by and depreciation at the rate of two per cent per year had been taken.

■ We give but little weight to the contract price and think that replacement cost less depreciation is an element deserving of scant consideration. See, *Olds v. Von der Hellen,* 127 Or. 276, 288, 263 P. 907, 270 P. 497.

There is evidence that the building is adaptable for a variety of uses, which we list: Bus terminal, automobile sales and service, merchandise mart, warehouse, jobbers' building, department store of the type of Sears, Roebuck & Co., newspaper plant, federal, state or municipal building. For most of these purposes costly alterations would be required.

Viewing the evidence in its entirety, we are of the opinion that it does not justify the valuation of $963,-943.96 found by the Circuit Court. That sum is nearly $64,000.00 greater than the appraisal of Mr. Bullier, witness for the City, who valued the property at $900,000.00, the lowest of any City witness. He was of the opinion that the highest and best use of the property was as a market. As we are unable to accept the basis for his opinion, we cannot concur in the finding of substantially greater value made by the court below.

■ In our judgment, the fair market value of this property on November 14, 1934, including land, building and equipment, and the offsets properly allowable as the result of the accounting, was $800,000.00. We have arrived at this figure after a careful review of the record in which we have endeavored to give due weight, not only to the opinions of the witnesses and the bases of those opinions, but as well to the evidence

respecting the type, character and construction of the building, its location, and every phase of the checkered history of the market property. The court is not an expert on the value of real estate in the City of Portland, but is expected to ascertain value from the opinions of experts. In this case the difficulties inherent in the problem have been increased by the bewildering variety of those opinions, for not only are the opposing witnesses very far apart but witnesses on the same side are not very close together. A difference, for example, of $350,000.00 between the high and low valuations of witnesses for the City is somewhat disturbing to one who looks for aid from the experts. The witnesses for the Market Company differ in their 1934 valuations by only the comparatively small sum of $100,000.00; but two of them thought the property had not increased in value since 1934, while two others found an increase of at least $250,000.00 between that year and 1943. In this somewhat confusing state of affairs, the court, while fully conscious of its own fallibility on a question of this kind, cannot but be impressed with the fallibility of the evidence of experts.

The difference between $800,000.00, the fair market value of the property as found by us on November 14, 1934, and the contract price, $1,463,943.96, is $663,943.96, and, under the rule of damages established in this case, plaintiff is entitled to recover judgment against the City for the last-named amount, together with interest thereon at the rate of six per cent per annum from November 14, 1934, until paid.

The decree of the Circuit Court properly provided that it should inure to the benefit of The First National Bank of Portland (Oregon), trustee for defendant Reconstruction Finance Corporation, for application *pro*

*tanto* upon the indebtedness of the plaintiff to the Reconstruction Finance Corporation.

The decree is modified as to the value of the property and the amount of the recovery in accordance with the foregoing opinion, and, as modified, is affirmed.