472

HAROLD E. PEARCE *et al., Respondents,* v. PUGET SOUND
BROADCASTING COMPANY, *Defendant,* SEATTLE
BROADCASTING COMPANY, *Appellant.*[1]

[1]Reported in 16 P. (2d) 843.

Byers & Byers and Alfred J. Westberg, for appellant.

Eggerman & Rosling, for respondents.

HOLCOMB, J.—This appeal results from a judgment in favor of respondents, who are husband and wife, and suing as such, who were engaged in the business of radio advertising in Seattle. Appellant, Seattle Broadcasting Co., operated a broadcasting station in Seattle known as KOL. Defendant Puget Sound Broadcasting Co., during all the time embraced in this action operated a broadcasting station known as KVI at Kent, Washington, and had studios in both Seattle and Tacoma. Both were sued to recover $4,100 as damages for breach of a written contract between respondents and defendant Puget Sound Broadcasting Co., originally alleged to have been adopted and assumed by appellant, which thereafter breached the contract.

Both defendants appeared and defended the action, but at the trial, before the cause went to the jury, it was dismissed by respondents as to the defendant Puget Sound Broadcasting Co.

Some time prior to the execution of the original contract which is the basis of this action, respondents conceived the idea of advertising through a program known as "The Thrift Home of the Air," which was a program prepared to appeal to the housewife, featuring household economics in the form of a dialogue between "Mrs. Thrift" and "Isabella," her colored maid. The merits of products of the advertisers were

disclosed to the listening public through the experiences of Isabella and the instructions of Mrs. Thrift to her. Advertising, as such, was kept in the background, and appropriate music created an atmosphere for the dialogue.

Respondents sought and obtained a contract with the Puget Sound Broadcasting Co., which operated station KVI in Seattle, to broadcast this program daily, except Sunday, for a period of one year beginning March 1, 1930; the program being built by respondents to appeal to the housewife, a period was selected from nine to nine-thirty in the morning, when the average housewife could sit down for half an hour and listen to household economics. The contract executed between them and KVI, on January 29, 1930, was upon a printed form, and discloses that six northwestern cities had been printed on the form, including Tacoma and Seattle, Washington, the names of all of which were crossed out with the exception of Seattle. Respondents insist that the striking of the names of the other cities except that of Seattle showed definitely that the program was to be broadcast through a Seattle station. It is insisted, also, that this was a material consideration to respondents, theirs being a Seattle business, with Seattle advertisers as clients.

Broadcasting over KVI in Seattle began March 1, 1930, and continued without interruption until April 9, 1930. By that time, the program had become established, they had regular patrons, and the program had acquired a following of listeners so that it had begun to show a substantial profit. On April 9, 1930, Doernbecher, then president of KVI, bought the controlling interest in the Seattle Broadcasting Company operating station KOL, in Seattle. KOL was moved from its former studio to the KVI studios in the Northern Life Tower, where it has since remained. KVI has since

that time generally been known to the public as a Tacoma station, and is announced on the air as "KVI, Tacoma."

Both before and after April 9, 1930, KVI maintained its transmitter at Kent, Washington, with a line running both to its Tacoma studio and the Northern Life Tower in Seattle, so it was possible for a performer to stand in the Northern Life Tower studio in Seattle and the broadcast would go upon the air at Kent, such a broadcast to be announced as originating in the Northern Life Tower, but the broadcast would be located on the dial at the KVI wave-length, and the station would be announced as "KVI, Tacoma."

On April 9, 1930, on arriving at the studios to put the program on the air as usual, Mrs. Pearce, who was known on the air as Miss Knowles, was advised that the program would be broadcast thereafter by KOL. That change meant retarding the development of the Thrift Home program, because it meant pioneering a new wave-length, and teaching the listeners to tune in upon a different wave-length and at a different place on the dial. Although they did not favor the change, there were some mitigating circumstances, because of which they accepted it, and so notified the owner of KOL. At that time, respondents were notified by Doernbecher, president of KVI and new owner of KOL, by the studio director and by one Krauss, commercial manager, that KOL had accepted the contract and would perform it.

The program continued to be broadcast by KOL throughout the rest of April and into the second week of May, 1930, without friction, and growing in appeal to advertisers as it continued. In the early part of May, Krauss was succeeded as commercial manager of KOL by one Van Schuck. Shortly thereafter, respondents were notified, first, that it would be necessary to

change their place on the program because of changes scheduled and, later, were informed that KOL would be unable to broadcast the Thrift Home program after June 1, 1930, because that time on the air had been given to a certain Seattle newspaper. Confirming these oral notices, on May 19, 1930, the new commercial manager of KOL wrote the following letter:

"Dear Miss Knowles:

"On account of the change of schedule beginning June 1, we do not feel that we can continue your arrangement with KVI.

"We would like to have you feel that we want to co-operate with you and do anything we can to keep your accounts that you now have on this station, active.

"We therefore would be very glad to enter into a similar arrangement such as you now have with KOMO; you will find in the long run that you will not regret our making this change. A satisfactory commission arrangement could be worked out and I believe it would prove profitable to you.

"Due to the fact that you have made arrangements for a period of time with your advertisers, we of course, wish to co-operate with you to the fullest extent.

"May we suggest that you come in so that we may work out something that will be satisfactory to all concerned? Yours very truly,

"Seattle Broadcasting Company,

"L. F. Van Schuck,

"Commercial Manager."

Upon receipt of this letter, Miss Knowles appealed to Doernbecher who, as she testified, confirmed the order that KOL would no longer broadcast the program after June 1, 1930.

Thereafter, two additional letters were received, both mailed in the same envelope, dated May 24, 1930, one from KVI and one from KOL, reading:

"Dear Miss Knowles:

"The Puget Sound Broadcasting Company, operating KVI, stands ready to place your program on the

air at its regular time each morning subject, of course, to your continuity and talent being acceptable to our station.

"These programs can be put on from KOL studios and transmitted over our Kent transmitter.

"This is in absolute accordance with our contract with you and we trust you can see your way clear to accept this arrangement.

      "Very truly yours,
      "Puget Sound Broadcasting Company,
          "E. M. Doernbecher, President."
"Dear Miss Knowles:

"As we have informed you, it will be impossible for KOL to continue broadcasting your programs after June 1st.

"This station, however, has made arrangements to permit KVI, the Puget Sound Broadcasting Company, the use of our studios to broadcast your program over the KOL transmitter.

"By making this arrangement, we have placed you in the same position as you were before KOL moved its studios, using the same studios—the same transmitter—and dealing with the same corporation.

"We regret that we cannot continue to put this program on over KOL, but conditions make it impossible to do so.      Yours very truly,
      "Seattle Broadcasting Company,
          "John W. Sparling, President."

Respondents replied to the foregoing letters as follows:.

          "May 26, 1930.
"Puget Sound Broadcasting Company,
"Northern Life Tower, Seattle.
"Gentlemen:

"We have your letter of May 24, 1930, stating that you stand ready to place our programs on the air, the programs to be put on at the KOL studios, but to be transmitted over your Tacoma station.

"Since April 9, 1930, when you moved the KVI station to Tacoma, our programs have been broadcast over KOL. We have never been advised whether the Seattle Broadcasting Company has formally adopted

our contract with you or not, although it has adopted it in practice. At any rate, we have just received a letter from them stating that they will not broadcast our programs after June 1, 1930. These two letters were apparently dictated at the same time, and came to us in the same envelope and were evidently intended to be read together.

"The interpretation you place upon the contract of January 29, 1930, is not correct. The contract calls for a broadcast over a Seattle station and you will appreciate that Seattle advertisers have no use for time over a Tacoma station. Your statement that a KVI broadcast is in accordance with the contract is an erroneous interpretation, and your unwillingness to continue except under your interpretation constitutes a repudiation of the contract and this letter is written to advise you that by reason thereof, we have elected and hereby elect to treat the contract as breached by you, and we shall hold you accountable for all damages we may sustain. . . .

"Yours truly,
"Pearce-Knowles."

The March rental of two hundred dollars was paid. The April and May rentals were not paid. The April rental was due May 10, and the May rental on June 10. During May, respondents repeatedly asked for a segregated bill for the month of April. This bill was finally given to them on May 24, long after KOL, appellant, had advised respondents that the contract would not be performed after June 1, 1930. The May rent not being due until June 10, no demand for its payment had or could have been made at the time of the alleged breach of contract by appellant.

In accordance with their letter, respondents continued to broadcast their Thrift Home program over KOL until Saturday, May 31, on which day arrangements were made to begin broadcasting over station KJR the following Monday, on a basis whereby that station was to receive one-half of the gross proceeds of

the program. Respondents continued to broadcast their program over that station until the following January, 1931, when it was discontinued, due to an accident sustained by Miss Knowles.

Under the foregoing facts, the jury found that KOL had adopted the KVI contract, and that it had breached its contract by refusing to broadcast after June 1, 1930, by which breach respondents had been damaged in the sum of $1,453.28. It appeared in evidence and was admitted during the trial that certain credit should be given respondents upon the rental during the performance of the program, which reduced the total rental due from them to the sum of $346.72. The trial court so instructed the jury, and that they should in no event allow more than the $346.72 as an offset to any damages found to be recoverable by respondents. Thus it is plain that the damages allowed by the jury, for the remaining nine months, was the sum of $1,800 less the $346.73.

Seventeen errors are claimed by appellant. The first and second errors claimed are that the court erred in refusing to sustain its demurrer to the amended complaint and in overruling its objection to the admission of any testimony, on the ground that the complaint does not state facts sufficient to constitute a cause of action.

The KVI contract in writing, pleaded by respondents and admitted by appellant, among other things, provided:

"For non-payment of any sum when due or a violation of any of the conditions herein, the company shall have the right to terminate any and all rights hereunder by either written or oral notice and may, without incurring any liability forthwith, refuse the right to use the station further, but the failure of the company to enforce any of the conditions or the waiver thereof in any instance shall not be construed as a

480

general waiver or relinquishment on its part of any of the terms or conditions of this contract but same shall remain in force and effect.''

One of the chief contentions of appellant is based upon the non-payment of the rental for the months of April and May because of that clause in the contract stipulating,

''For non-payment of any sum when due or a violation of any of the conditions herein, the company shall have the right to terminate any and all rights hereunder.''

The correspondence above set out, supplemented by testimony on behalf of respondents, shows that appellant breached the contract by changing the period on the air stipulated for by respondents and selling it to another Seattle advertiser. Since the jury believed the testimony of respondents, and the correspondence, of itself, indubitably shows a breach of the contract by appellant and, further, that appellant did not specify in its letters non-payment of any rental as the reason why the broadcast was to be discontinued by it, that cause is unavailing to appellant.

*McCormick v. Tappendorf,* 51 Wash. 312, 99 Pac. 2, and *Williams v. Wright,* 68 Wash. 341, 123 Pac. 446, cited by appellant in support of this contention, are not apt. In the first cited case, appellant quotes as follows:

''It is true that the appellants could have had no right of action for breach of contract until they had actually made delivery and payment had been refused; but the respondents brought this action, claiming a breach by appellants for failure to deliver the ties. We think they are not entitled to recover, and that appellants are excused, if the evidence shows that at the time the respondents were not in position to make payment as the contract required.''

However, the same decision immediately continues: "One party need not perform a condition precedent if it appears that the other party cannot or will not perform."

This last principle applies to appellant.

Moreover, when one party terminates a contract for an express reason, he cannot thereafter sustain his action by specifying another breach not referred to at the time, but which, if referred to, could have been cured. *North Pacific Finance Corporation v. Howell-Thompson Motor Co.,* 162 Wash. 387, 298 Pac. 424. Since forfeitures are not favored by the law, had appellant specified as the reason for discontinuing the broadcasting for respondents, the nonpayment of any monthly rental, that could have been cured by them and the contract kept in force. Therefore, these contentions of appellant are untenable.

Another contention vigorously asserted by appellant is that the contract was not assumed by KOL. That was a question of fact for the jury to determine, and, as shown by the correspondence and oral testimony of respondents and Krauss, who had been commercial manager of KOL, there was ample testimony to go to the jury as to the adoption and assumption of the contract of KVI by KOL. The most conclusive proof thereof was that it continued performance under the same terms until May 31.

Another complaint of appellant is as to the proof of damages.

Arguing from the premise that the evidence did not show that the business of respondents was established and going and not a mere experiment, it is asserted that there was no evidence from which the jury could ascertain that there had been damage, and that the evidence as to what prospective profits had been lost by

respondents was too conjectural and speculative to justify any damages.

We agree with the trial court that there is ample evidence in the record from which the jury could determine that there had been damage. By June 1, 1930, the Thrift Home program had been broadcast for three months and had demonstrated its continued earning capacity. An expert in radio advertising testified on behalf of respondents that the program had passed the pioneering stage and was in good shape the first part of May. There was proof thereof sufficient for the jury to pass upon as to that phase and the case for respondents meets the test laid down in *Brinnon Logging Co. v. Carlsborg Mill & Timber Co.,* 122 Wash. 483, 210 Pac. 945; *Schultz v. Wells Butchers' Supply Co.,* 151 Wash. 382, 275 Pac. 737, and *Lockit Cap Co. v. Globe Mfg. Co.,* 158 Wash. 183, 290 Pac. 813. The premise laid down by appellant is therefore incorrect, and the question becomes one of whether or not the anticipated profits proven by respondents were purely speculative and conjectural.

The evidence on behalf of respondents discloses that eleven accounts shown by them which they had prior to the alleged breach of the contract by appellant, which ranged from seventy-five to two hundred dollars per month for advertising by broadcasting their products, were either dropped or reduced in monthly compensation by the patrons of respondents, so that the losses from those patrons alone amounted to more than the $1,800 damages allowed by the jury. All this evidence was material and competent, in the event it was determined that the business was an established business, that the contract of KVI had been adopted and assumed by appellant, and that respondents had lost all or part of their monthly compensation from any of

their advertising customers by reason of the breach of the contract by appellant.

In this connection, appellant also contends that respondents should charge themselves with salaries before determining the amount of the partnership profit, and argues that such a charge would entirely wipe out all profit. No authority is cited to sustain this proposition, and it is untenable. Respondents were husband and wife, suing as such and not as conventional partners. Whatever profit was made by the enterprise belonged to both and each of them. It is obvious, also, that whatever profit was made would necessarily stand in place of any salary.

A number of errors are assigned as to the rejection of requested instructions and the giving of instructions by the trial court.

The requested instructions and the instructions excepted to are much too long to set forth in the proper compass of an opinion in this case. All of them have been examined, and we can find no error in any instruction given by the trial court; and the substance of most of the requested instructions, in so far as they are correct statements of the law applicable to the case, was given in terse and lucid form by the trial court.

We consider the question of the actual or apparent authority of Krauss as an agent of appellant in accepting the KVI contract on behalf of KOL, unimportant, although the trial court fully instructed the jury thereon, inasmuch as the new owner of KOL, who was the owner of KVI, proceeded immediately, after purchasing KOL, to broadcast respondents' program as before. No harm could possibly have been done to appellant by so instructing.

Appellant requested an instruction as to the actual or apparent authority of Krauss, which was not given. Another instruction was given by the trial court

as to such authority, of which appellant complains that it contained much matter not in issue and as to which there was no testimony. The instruction has been examined, and while it is somewhat beyond the issues in the case, it is a correct statement of an abstract principle of law under our own cases, respecting actual and apparent authority of an agent, and prejudice will not be inferred from a general statement of law because there was no evidence on the subject, where other instructions directed the jury to be governed by the evidence alone. *Jurisch v. Puget Transportation Co.*, 144 Wash. 409, 258 Pac. 39; *Stokes v. Magnolia Milling Co.*, 165 Wash. 311, 5 P. (2d) 339.

Every issue, including the issue of agency, which as we have said became comparatively unimportant under the situation shown in this case, was submitted by the court to the jury under valid instructions as to the law.

Other alleged errors argued by appellant relating to the admission of certain testimony, refusing to strike the testimony of Krauss, and admission of evidence as to losses sustained on KJR, have been considered and concluded to be without merit.

The entire record has been examined. We consider the case carefully tried by the trial court, properly submitted to the jury on all issues, and the verdict of the jury well within the evidence as to the damages.

The judgment on the verdict is affirmed.

TOLMAN, C. J., MITCHELL, PARKER, and MILLARD, JJ., concur.