[No. 26234.   Department One.   December 16, 1936.]

· J. W. CATARAU, *Appellant, v.* SUNDE & D'EVERS COM-
PANY *et al., Respondents.*[1]

[1]Reported in 63 P. (2d) 365.

*C. R. Hovey* and *Edward J. Burns,* for appellant.
*Bayley & Croson,* for respondents.

STEINERT, J.—This is an action for damages for the alleged wrongful issuance and circulation of false credit information concerning plaintiff and his business. Trial before the court, sitting with a jury, resulted in a verdict for defendants. Following the verdict, the court entered judgment dismissing the action. Plaintiff has appealed.

For some time prior to, and during, the year 1933, appellant, operating under the name of Pacific Fishing Tools Manufacturing Company, was engaged in the business of manufacturing various kinds of fishing tackle. He had perfected, and obtained patents on, a number of inventions, most of them relating to fishing apparatus of one kind or another. He had also invented and patented a life preserver having a novel and ingenious fastener. Some time in January or February of 1934, the name of the business was changed to Marine Appliance Manufacturing Company. This change, it is claimed by appellant, was made because of his poor credit rating at that time, brought about by the false report emanating from respondents.

Respondent Sunde & d'Evers is a corporation engaged in the business of ship chandler and distributor of various kinds of marine supplies, including fishing apparatus. Respondent Seattle Association of Credit Men is a non-profit corporation owned and controlled by a number of wholesalers, manufacturers, and bankers of Seattle. Its purpose and objects are to furnish credit information to its members, collect slow and doubtful accounts, aid in the rehabilitation of failing debtors, and liquidate insolvent concerns. Sunde & d'Evers is a stockholding member of the association.

This lawsuit is the outgrowth of certain commercial transactions had between appellant and respondent Sunde & d'Evers.

Prior to August, 1933, appellant had, from time to time, delivered to Sunde & d'Evers various kinds of fishing apparatus which had been devised by him. According to appellant's contention, supported by his testimony, these deliveries were made upon terms of outright sale, and the amount owing for them by Sunde & d'Evers, in August, 1933, was one hundred thirty-two dollars. The contention of Sunde & d'Evers, as disclosed by its evidence, was that these deliveries were made on consignment, and that the merchandise so delivered was either to be paid or else accounted for after the consignee's annual inventory had been taken. According to its further contention and evidence, Sunde & d'Evers sold a part of this merchandise, for which appellant was entitled to $75.35, and that amount, less a deduction of $33.90, hereinafter referred to, was remitted to appellant in the early part of 1934.

In the meantime, during the month of August, 1933, appellant had purchased outright from Sunde & d'Evers a quantity of merchandise amounting to $33.90. Deliveries thereof were made in two lots. On the first of the following month, a bill for the entire purchase price was sent to appellant, but no attention was paid thereto by him. Bills were also sent in October and November, respectively, and still no payment was made. Between these dates, the company's collector called at appellant's place of business, but without success.

On December 5, 1933, Sunde & d'Evers wrote to appellant as follows:

"Your account for $33.90 is now overdue and as we are members of the Seattle Association of Credit Men,

it is necessary for us to report all past due accounts to them. Of course, you know such a report will affect your credit, and so we are reluctant to do this.

"Please let us have your check and such action will be unnecessary."

Appellant testified that, on receipt of this letter, he telephoned the manager of Sunde & d'Evers and was told by him not to worry about it, that everything would be all right. This was denied by the manager.

On December 19, 1933, a stereotyped form of letter, purporting to come from Seattle Association of Credit Men, was received by appellant. In that letter, it was recited, among other things, that appellant's account with Sunde & d'Evers in the sum of $33.90 had been reported to the association as overdue and unpaid; that appellant's credit would be best preserved by strict adherence to sales terms; that the members of the association were entitled, upon call, to have information regarding appellant's obligations to other members; and that, if such call were presently made, the association would, of necessity, have to show that appellant was owing the above overdue amount.

The only evidence regarding the authorship of this letter is that it was sent, not by the Seattle Association of Credit Men, but by Sunde & d'Evers, from a stock pad supplied to it by its corespondent.

Appellant's complaint is predicated upon the contentions and charges that, by reason of the condition of the mutual accounts, as testified to by him, he did not owe Sunde & d'Evers anything; that, nevertheless, Sunde & d'Evers, by its letter of December 5, had threatened to ruin his credit in the community by having his name placed on a list kept by Seattle Association of Credit Men of individuals who failed and refused to pay their bills, and that the association had followed that procedure; that, in consequence of the re-

port so made and listed, appellant had been unable to get credit, had been placed on the C. O. D. list of a number of firms, and had lost the benefit of an investment of twenty-five thousand dollars, which a third party had agreed to contribute to his business, to be used for the manufacture and sale of his patented life preservers. Appellant sought recovery in the sum of sixty-seven thousand dollars.

The evidence was in conflict throughout. At the conclusion of the testimony, the court withdrew from the jury the issues respecting certain items of damage. As to the remainder, the jury found for the respondents.

Appellant's first assignment of error is that he was compelled to try his case before a biased jury, in that two jurors who were subject to challenge for cause were permitted to remain on the panel after his peremptory challenges had all been exhausted.

Rem. Rev. Stat., § 330 [P. C. § 8495] (2), on which appellant relies, provides that a juror may be challenged for implied bias upon the ground that he stands in the relation of an employee or of a member of the family of the adverse party.

Among the first twelve jurors drawn was a lady, juror No. 10, whose husband was the treasurer of a corporation which held stock in Seattle Association of Credit Men. Another juror, No. 12, was employed as a checker for a concern that also held stock in the association.

Juror No. 10, after examination, was passed for cause by both sides. Juror No. 12, after examination, was challenged for cause by appellant, on the ground that he was "an employee of a party to the suit." The challenge was denied by the court, and, later, appellant challenged the juror peremptorily. Thereafter, appellant exercised his two remaining peremptory challenges by excusing two other jurors who had not been

challenged for cause. One of these, juror No. 7, was replaced by a juror who was the manager of an incorporated lumber-selling agency whose stockholders were a group of milling companies which sold their products to wholesalers. It does not appear that either the lumber agency or any of the milling companies were members of the Seattle Association of Credit Men. The last mentioned juror, No. 7, was duly passed for cause by both parties.

It thus appears that, even if juror No. 10 or juror No. 7 was subject to challenge for cause, the right as against them was never exercised or suggested. It was, therefore, waived.

■ But, in any event, there was no ground for challenge for cause as to any of the three jurors mentioned. None of them was employed by either of the respondents, who were the adverse parties in the suit. Two of the jurors were employees of corporations which merely held stock membership in the credit association, and the third was the wife of an officer of another stockholding member; but none of the stockholding corporations were parties to the present litigation.

An employee, or a member of the family, of a stockholder in a corporation is not disqualified as a juror by Rem. Rev. Stat., § 330 [P. C. § 8495] (2), if the stockholder by whom the juror is employed, or to whose family he belongs, is not an adverse party in the suit. There was no disqualifying relationship in this case.

■ Appellant's second assignment of error is that the court limited his claims for damages to the instances recited in his bill of particulars and refused to permit recovery of damages for loss of credit generally.

In his complaint as amended, appellant alleged that the acts of the respondents in communicating the false

information had damaged him in the respects thereinafter set forth. He then alleged as items of damage: (1) His failure to obtain credit from various firms for the printing of a contemplated catalogue; (2) his failure to obtain credit, generally, from other firms; and (3) his failure to obtain the twenty-five thousand dollar investment in his business, promised to him by a third party.

By motion to make the pleading more definite and certain and, in the alternative, by demand for bill of particulars, respondents asked that appellant be required to state the names of the persons who had refused him credit. Appellant complied with the demand and gave the names of five particular individuals or firms. Upon the trial, the court confined appellant to the particular instances. In this, the court was correct, for, otherwise, respondents would not have been in a position to meet the charges, as they did meet those that were specifically stated. Appellant made no request to amend his complaint, nor did he submit any offer of proof as to other instances, in which latter event respondents might have been entitled to a continuance. At any rate, the record discloses that appellant was permitted to, and did, offer evidence as to the charges on which he was particularly relying. As to some of these, the evidence was insufficient to take the case to the jury. As to the remainder, the jury found against him. Upon this assignment, we find no error.

■ The third assignment of error is predicated upon the withdrawal, by the court, of the issue based on appellant's claim for damages because of his failure to obtain credit from a particular individual for a catalogue which appellant desired to have printed.

Appellant had previously obtained credit from the designated printer, but only in small amounts of

twenty-five or thirty dollars. He later desired to have a catalogue printed which would cost eight hundred fifty dollars. The printer went to his bank to obtain a report on appellant. The report was unfavorable, and the credit was refused. Appellant now attempts to charge this against the respondents. But there was no proof whatever that the report which the bank gave the printer emanated from either of the respondents. That issue was, therefore, properly withdrawn from the jury.

■ The fourth assignment of error is based on the court's withdrawal of the issue concerning the contemplated investment of twenty-five thousand dollars, promised by a third party. The evidence of appellant upon that issue was as follows: Sometime in 1929, appellant, while on a hunting trip in Alaska, had met one G. H. duBarry, who was then engaged in the piano business in Seattle. The friendship between the two men continued and grew after they had returned from the trip, and, during the subsequent period, duBarry became interested in appellant's patented life preserver. In 1931, duBarry retired from active business, but apparently remained in Seattle, for a time at least. In November, 1933, in a private conference held at a hotel in Seattle, duBarry exhibited to appellant a gunny sack containing a large amount of English, Australian, and New Zealand gold pounds, at the same time declaring that he was the owner of five thousand pounds in gold. DuBarry subsequently testified that he had over twenty-five thousand dollars in gold bullion, but he did not disclose where it was kept at the time, other than to say that it was somewhere in Canada.

According to the testimony of both the appellant and duBarry, they had entered into a verbal agreement, in December, 1933, to the effect that duBarry was to in-

vest twenty-five thousand dollars in appellant's business; that a corporation was to be organized to take over appellant's patent rights on the life preserver and proceed with the manufacture and sale of the patented article. DuBarry, according to his testimony, was to receive twenty per cent of the stock of the corporation and was to be its sales manager.

After the agreement had been made, duBarry left for Oregon and did not return to Seattle until March of 1934. On his return, he endeavored to contact appellant but was advised that he had gone out of business. His investigation led him to the office of Seattle Association of Credit Men, where he was told by a young lady in charge of the interchange department that appellant was not paying his bills, special mention being made of the account owing Sunde & d'Evers. On receiving this unfavorable report, duBarry decided not to invest his money in the business.

Appellant also introduced other evidence to the effect that the patented life preserver was a very meritorious device, was the only one of its kind, and would be readily marketable.

Passing, without comment, the extraordinary circumstances under which the agreement was made, and overlooking the fact that many essential details were not provided for, we face a situation where there is nothing but conjecture upon which damages could be predicated. The patent was new and untried. A corporation had yet to be organized. A factory had to be built or otherwise obtained. The life preservers had to be manufactured and then sold to advantage. At most, the agreement merely contemplated a business venture and experiment. It would be impossible for anyone to say that the venture would have been a success, and, if it were, to what extent profits would have been realized.

In order to recover damages for loss of profits to a business, it must appear that the business has been in successful operation for such a period of time as to give it permanence and recognition. *Webster v. Beau,* 77 Wash. 444, 137 Pac. 1013, 51 L. R. A. (N. S.) 81; *Andreopulos v. Peresteredes,* 95 Wash. 282, 163 Pac. 770; *Schultz v. Wells Butchers' Supply Co.,* 151 Wash. 382, 275 Pac. 737; *Lockit Cap Co. v. Globe Mfg. Co.,* 158 Wash. 183, 290 Pac. 813; *Blakiston v. Osgood Panel & Veneer Co.,* 173 Wash. 435, 23 P. (2d) 397; *Automatic Canteen Co. of Washington v. Automatic Canteen Co. of America,* 182 Wash. 133, 45 P. (2d) 41; 17 C. J. 797, § 118.

There was nothing substantial upon which the court could submit the issue of the contemplated investment. That issue was, therefore, properly withdrawn from the jury.

The remaining assignments of error are fully covered by what has already been said herein.

The judgment is affirmed.

HOLCOMB, BLAKE, GERAGHTY, and MAIN, JJ., concur.