Argued April 4, 1957, affirmed February 26, 1958

## MARR ET AL *v.* PUTNAM ET AL
321 P. 2d 1061

20

*Wallace P. Carson*, Salem, argued the cause for appellants. With him on the briefs were Moody & Lamkin, and Allan G. Carson, Salem.

*Norman K. Winslow*, Salem, argued the cause for respondents. With him on the briefs was W. C. Winslow, Salem.

Before Perry, Chief Justice, and Rossman, Lusk, Brand, McAllister and Kester, Justices.

KESTER, J.

This is an appeal by defendants from a judgment for plaintiffs in an action of libel.

The case was previously in this court after a nonsuit had been granted. In *Marr v. Putnam*, 196 Or 1, 246 P 509, the judgment of nonsuit was reversed and the cause was remanded for a new trial. The case was tried again on the same pleadings, and plaintiffs' evidence on the second trial was substantially the same as on the first trial. The jury returned a verdict for plaintiffs in the amount of $4,000, upon which the judgment was entered from which this appeal is taken.

In view of the full discussion in the prior opinion, our statement of facts will be brief. Plaintiffs, John E.

Marr and Robert B. Marr, who were brothers, were engaged in a small radio repair business in the city of Salem, as a sideline while they were students at Willamette University. Their workshop was in the attic of John's house, and John did the repair work while Robert attended to the business end. Business was solicited primarily by newspaper advertising, and from the latter part of November continuously until the end of December, 1946, they inserted in the two Salem daily newspapers, the Capital Journal and the Oregon Statesman, the following advertisement:

"GUARANTEED RADIO SERVICE, Free pick-up and delivery. Ph. 9098."

The phone number was that of a service station, the operator of which had agreed to accept calls for them; and their practice was that upon receipt of telephoned orders Robert picked up the radio sets and took them to John's house to be repaired, after which Robert redelivered the sets to the owners. On December 4, 1956, defendant Putnam (who was owner and publisher of the Capital Journal), acting on information supplied by defendant Moore (who operated a full-time radio repair business in Salem), published in the Capital Journal the following article:

"SLICKERS WORK RADIO RACKET

"Established radio dealers and repair plants in the city are becoming alarmed over what appears to be a 'radio racket' which causes owners to lose their sets and much embarrassment upon the part of the dealer.

" 'The common practise [sic] of these slickers is not to operate from any established shop but just give a phone number of call and offer free pick-up service,' according to Ray Moore, 3720 Portland road, who has had personal experience along this line.

" 'In most instances the name is not listed and since it is impractical to properly service most radios in the home, the set is taken away and that is the last the owner sees of his radio. In some cases the customers were told that the radios would be taken to some well-known or established shop and considerable ill-feeling has developed when owners, not getting their radios delivered after sufficient lapse of time to make repairs or adjustments, have called at the shop they supposed the set was taken only to find that it was not there.'

"Moore suggests that the best curb on the racket is for owners of radios to, whenever possible, take the set into the shop in person where, if necessary to leave the radio for any time, a proper receipt will be issued."

It is admitted that plaintiffs were not guilty of the practices referred to in the newspaper story; but defendants contend that the article was abstractly true, and that it was not intended, and could not reasonably have been understood, to refer to plaintiffs. Plaintiffs alleged and offered evidence, however, that at the time of publication of the article, and for some time prior thereto, they were the only persons in Salem conducting a radio repair business who advertised in that manner; and they offered evidence that some readers of the paper thought the article referred to them. After publication of the article, plaintiffs received only one more call by means of their advertisement.

Upon the second trial the court, applying the law as determined on the former appeal, limited the issues submitted to the jury to: (1) whether the newspaper article was applicable to plaintiffs; and (2) if so, whether the publication caused actual damage to plaintiffs' business, and if so, in what amount. The jury was told that the article was libelous per se, and that

if it was directed to plaintiffs they were entitled to at least nominal damages. The matter of compensatory damages was expressly limited to plaintiffs' business, as distinguished from personal damages, and the claim for punitive damages was withdrawn by the court.

■ Appellants submit twenty-four assignments of error, most of which present questions that were determined adversely to defendants on the former appeal. Under the well-settled doctrine of "the law of the case," the former decision must be deemed to be controlling, so far as the questions are the same. *Public Market v. Portland*, 179 Or 367, 373, 170 P2d 586, cert. den. 330 US 829; *Portland T. & S. Bank v. Lincoln Realty*, 187 Or 443, 451, 211 P2d 736; *Finn v. S. P. & S.*, 194 Or 288, 292, 241 P2d 876.

■ Defendants frankly ask that the former decision be reconsidered and overruled. However, that decision was the result of careful deliberation—the case was argued once and then reargued, the two dissenting opinions necessitated further consideration, and after the opinion was announced a petition for rehearing was considered and denied. While we agree with appellants that a court should not blindly adhere to a former decision that is manifestly erroneous, stability of the law requires that there be very cogent reasons for abandoning a former decision, particularly when it was between the same parties and on the same pleadings.

■ A number of defendants' assignments of error (Nos. 5, 6, 7, 8 and 9) relate to the admission in evidence of testimony by various witnesses who knew the plaintiffs and their business, who had read the newspaper article at about the time it was published, and who, upon reading it, thought it applied to plaintiffs. Defendants' argument here is twofold: First,

that the article was not ambiguous, and therefore that testimony was not admissible in any event to show its applicability to plaintiffs; and Second, that these witnesses were not shown to be specially qualified to draw an inference of its applicability to plaintiffs.

The arguments are foreclosed by the prior opinion. In that appeal, as here, defendants contended that the article was inapplicable to plaintiffs as a matter of law; but it was held that the question of applicability was one of fact, and for the jury. On the issue of whether the published article could reasonably have been interpreted as applying to plaintiffs, evidence was admissible that persons familiar with plaintiffs and their business did so construe it. The same evidence was offered on the former trial as is referred to in these assignments, and the same objections were made, but this court deemed the evidence competent and relevant and gave it weight in passing upon the propriety of the nonsuit. No special qualification was necessary, other than the witnesses' familiarity with plaintiffs and their method of operation. Odgers on Libel and Slander 6th ed, pp 126, 559.

It is true that in *State v. Mason*, 26 Or 273, 275, 38 P 130, 26 LRA 779, the admissibility of such evidence was predicated upon the fact that the article was ambiguous. But the ambiguity in that case existed merely in the fact that the news story did not expressly name the person who was the subject of the article, and proof was therefore admissible to show the person to whom the article referred. The same situation exists in this case.

██ Another group of assignments of error (Nos. 1, 2, 3 and 4) raises a similar question, but once removed. Evidence was admitted as to the statements of third persons with respect to the applicability to plain-

tiffs of the published article. In each instance a witness was permitted to testify as to a conversation with another person, out of court, and not in the presence of either of the defendants, wherein the other person's comments indicated that he interpreted the article as referring to plaintiffs. While a number of grounds of objection were stated in the lower court, the argument here is limited to the objection that the statements were hearsay.

The exclusionary force of the hearsay rule is not applicable when the extra-judicial statement of a third person is not offered to prove the truth of the utterance, but only to show that the statement was made. Where the mere fact that the statement was made is independently relevant, regardless of its truth or falsity (as, for example, to show the state of mind of the declarant, where that fact is in issue), such evidence is admissible. Wigmore on Evidence, 3d ed, § 1789; 20 Am Jur 404, Evidence § 457; 31 CJS 988, Evidence § 239; see *Wayne v. Huber*, 134 Or 464, 503, 291 P 356, 294 P 590, 79 ALR 1427.

■ The present evidence falls within the latter category. The fact that third persons thought the article referred to plaintiffs was in the nature of an ultimate fact, which was material to plaintiffs' cause of action. The statements of those persons, although out of court, were relevant circumstances tending to prove their contemporaneous interpretation of the article. Thus in one of the instances plaintiff Robert Marr testified that as he approached a group of students on the morning following the publication, he was greeted with the words, "Hi, slicker" or "Hi, racketeer." This testimony was not offered to prove that he was a slicker or racketeer, or even that the speakers actually believed him to be, but merely to show that they interpreted the

article as having so described him. For such purpose it was admissible.

Assignment No. 10 is directed to the exclusion of defendants' exhibits "P" and "Q". These were copies of pages of the Oregon Journal, a newspaper published in Portland, dated April 4, 1945, containing the following advertisement:

"RADIOS REPAIRED—3-day service. Free pickup, delivery and estimates. OPA prices. Guaranteed work. 15 years exp. Call us now. MU 4530 or BR 1986."

Defendants state that the purpose of the offer was "to show that, in fact, plaintiffs were not the only persons who had advertised in this locality by identifying themselves by telephone number, only." We take judicial notice that the phone numbers in the last-quoted advertisement were Portland phone numbers, and that the Oregon Journal has Salem circulation. It is not contended that those who placed the Oregon Journal advertisement were guilty of the practices condemned in defendants' news story.

As mentioned previously, plaintiffs alleged and offered proof that they were the only ones who thus advertised a radio repair service: (1) in the city of Salem; and (2) at the time of publication of the article and for some time prior thereto. Defendants' contention is that the news article was not limited as to the time or place of the practices mentioned, and therefore they should be permitted to prove advertisements in a Portland paper, some twenty months previously.

However, the article says that "Established radio dealers and repair plants *in the city* are becoming alarmed * * *." (Emphasis ours.) Furthermore it describes the source of the information as "* * * according to Ray Moore, 3720 Portland road [a Salem

address], who has had personal experience along this line;" and it speaks entirely in the present tense. We think the fair import of the article was to say that the practices therein mentioned existed currently in or about the city of Salem.

On the question of the applicability of the article to plaintiffs, evidence was admissible as to whether others were advertising in the described manner in or about the city of Salem and at or about the time of the publication. But evidence as to an advertisement in a Portland paper, of what was apparently a business located in Portland, over a year and a half previously, was too remote to be relevant.

■ Assignment of error No. 11 is based upon the trial court's denial of defendants' motion for a directed verdict. The issue thus raised is essentially the same as on the former appeal, and the various points now urged were all considered by the court at that time. The evidence is not less favorable to plaintiffs now than it was at the former trial, and under the former decision the case was one for the jury.

■ Assignments 12, 13 and 14 assert error in failing to give instructions requested by defendants with respect to nominal damages. The first two requests would have limited plaintiffs' recovery to nominal damages only; and the third, as an alternative, would have told the jury that no more than nominal damages should be allowed unless "reasonable people acting upon inference, and not from guesswork, can derive therefrom that damage actually did thus result, and can further derive therefrom substantial data for fixing the amount."

As to the first two requests, the evidence of damage to plaintiffs' business was substantially the same at both trials. In both, plaintiffs' actual books of account

were introduced, and they showed a marked decline in business after the publication. In the former opinion it was held that the jury could have found that the decline in business was a consequence of the libel and not a mere coincidence (196 Or at 29). There was no error in refusing to limit recovery to nominal damages.

■ As to the third request, the instructions given by the trial court amply covered the subject of nominal damages in the event that no actual damages were proved. The jury was told in no uncertain terms that:

"If * * * the rights of the plaintiffs were invaded by the publication of the article in question, but you cannot determine from a preponderance of the evidence that the plaintiffs suffered a loss of business as the result of such publication of said article, any verdict for the plaintiffs at your hands must be for only nominal damages."

There was no error in refusing the request.

■ The next group of assignments of error (Nos. 15, 16, 17, 18, 19 and 20) relates to the matter of qualified privilege and fair comment on matters of public interest. The trial court withdrew the defense based on that theory (or theories) and refused requested instructions that would have submitted such issues. In doing so the trial court followed the law as determined on the former appeal (196 Or at 30-35), and no error was committed.

Assignment of error No. 21 complains of the refusal of an instruction that would have submitted to the jury the issue of truth as a complete defense. Under the last preceding group of assignments, defendants also argue that removal of the defense of qualified privilege or fair comment in effect negatived truth as a defense.

■ While truth is ordinarily a defense in an

action of libel (ORS 16.530(2)), (¹) in this case the question of truth was taken out of the case when defendants admitted that the plaintiffs were not guilty of the practices described in the article. In other words, whether or not the article was abstractly true, it is admitted that the article was not true *as applied to plaintiffs*. The issue then was simply whether the article was applicable to plaintiffs, and if it was, then defendants were liable and the only remaining question was that of damages. No error was committed in refusing the request.

Assignment No. 22 complains of the refusal to give an instruction to the effect that plaintiffs were under a duty to use "due diligence" to minimize their damages, and that any failure to minimize damages should be taken into account by the jury in making an award.

Assuming, without deciding, that the duty to minimize damages applies to a libel action (as to which no authorities are cited), the requested instruction did not define "due diligence" and was therefore incomplete. Where the duty to minimize damages exists, it is only to use the care of a reasonably prudent person. *Boyd v. Grove*, 89 Or 80, 83, 173 P 310. Without a definition of "due diligence" the jury would have been left without a standard by which to measure plaintiffs' conduct.

However, we are of the opinion that in any event there was no evidence that plaintiffs failed to exercise reasonable care to minimize their damages. On the day following the publication defendants went to the

---

(¹) ORS 16.530

"* * * * *

"(2) The defendant may, in his answer, allege both the truth of the matter charged as defamatory, and any mitigating circumstances, to reduce the amount of damages; and whether he prove the justification or not, he may give in evidence the mitigating circumstances."

Capital Journal office and talked to several people, including the reporter who wrote the article. They requested that the paper print a retraction or a story indicating that the original article did not apply to them, but their request was refused. Defendants assert that plaintiffs should have changed their method of advertising so as to avoid being classed with those at whom the article was aimed, but we do not think that was required under the circumstances.

■ The next assignment is based on two portions of the instructions given, wherein the trial court instructed the jury that the article was libelous per se. The objection is that it could not be libelous per se unless it showed on its face that it applied to plaintiffs. It is also urged that mention of the subject twice was prejudicial repetition.

■ The first ground is determined adversely to defendants in the prior opinion (196 Or at 29-30). As to the second, viewing the charge as a whole, we can find no undue repetition. The first mention occurred while explaining that proof of actual malice was unnecessary, and the second mention occurred while explaining that some damage was presumed.

The final assignment of error objects to an instruction given which defined the function of an "innuendo" in a libel action. The argument here again attempts to avoid the effect of the former opinion by asserting that "Words which are libelous per se do not need an innuendo, and words which need an innuendo are not libelous per se."

■ In the former opinion it was determined that the article was libelous per se, even though extrinsic evidence was required to show its application to plaintiffs (196 Or at 39). The present instruction was merely an explanation of a portion of the complaint, and it

expressly told the jury that the innuendo could not be used to extend or change the language used. The trial judge said: "If the words complained of are not in fact actionable, no innuendo can make them so." Since applicability to plaintiffs was one of the principal issues, an instruction on the subject of innuendo was not erroneous in the light of the former decision.

We have found no error, and the judgment is affirmed.

ROSSMAN, J., dissenting.

I dissent for the reasons which I group in the following three categories: (1) Although the instructions to the jury stated that the measure of damage was an "amount of money as will justly compensate plaintiffs for damages, if any, done by the publication of the article to their business, and to their business alone," the record contains no evidence that the slight amount of business which the plaintiffs had done yielded a profit or would probably yield one in the future. (2) Although this is an action for defamation, the instruction above quoted authorized the jury to award damages for all injuries "done by the publication of the article to their [plaintiffs'] business;" and, therefore, empowered the jury to include in the award something for injury to the business, whether or not the injury was the result of the alleged defamation of the plaintiffs. For example, suppose that A, who knew nothing whatever of the plaintiffs, had a radio which needed repairs and who, after reading the defendants' article, became apprehensive of all "blind ads" and thereupon concluded it would be better not to telephone to "Ph. 9098" (the number given in the plaintiffs' advertisement). The challenged instruction authorized the jury to deem as a subject for redress, by the award of damages, any instance in which a prospective customer

refrained from telephoning to "Ph. 9098" (a) whether or not he was aware of the plaintiffs' existence, and (b) whether or not the plaintiffs were defamed to him. (3) The reasons stated in my dissenting opinion in *Marr v. Putnam, et al.*, 196 Or 1, 246 P2d 509.

It is important that we bear in mind the fact that the damages awarded by the challenged judgment have been granted, not to the plaintiffs as individuals, but to them as a partnership, and upon the premise that the partnership business was defamed by the published article and thereby damaged. The judgment, as the majority decision says, was predicated upon the proposition that "the publication caused actual damage to plaintiffs' business. * * * The matter of compensatory damages was expressly limited to plaintiffs' business as distinguished from personal damages." The majority recognizes, as Restatement of the Law, Torts, § 562, Comment (b), does, the distinction between the damages which a partnership may recover for harm done to its business and the additional sums which the members of the partnership may recover for any defamation of them personally by the wrongful publication. As is pointed out in "Restatement of the Law of Torts," 89 Pa Law Rev 265 at 283, Section 562, supra, deems a partnership, in instances such as the one at bar, "as a legal person distinct from the partners." Accordingly, since the jury was cautioned to allow nothing in this action which either of the plaintiffs as an individual could recover in an action instituted by himself, it becomes necessary to determine whether the partnership had a business of the character that the law of damages recognizes as the basis for an award.

First, it is well to take note of the fact that the defendants, in the course of the trial in the circuit

court, repeatedly objected that the evidence did not show that the plaintiffs had a business which could afford a basis for the award of damages. For example, at the close of the instructions, the defendants challenged, by proper exceptions, the instruction quoted in part in a preceding paragraph. The material part of that instruction was the following:

> "* * * I instruct you that as a matter of law * * * you shall not award to plaintiffs any amount for any alleged injuries done to their persons or reputations, but * * * to such amount of money as will justly compensate plaintiffs for damages, if any, done by the publication of the article to their business, and to their business alone."

The defendants' exception was the following:

> "Defendants except to the giving by the Court to the jury of the instruction defining general damages on the ground and for the reason that under the evidence in this case, we respectfully urge, there was no basis for any general damages exceeding a nominal amount, * * *."

The quoted instruction, which was based upon a hypothesis that the business was that of the plaintiffs as partners, was the result of the holding in *Marr v. Putnam, et al.*, 196 Or 1, 36, 246 P2d 524, that the action which the plaintiffs had filed was instituted by them as a partnership and not in their individual capacities. By reverting to that decision, it will be noticed that the ruling was made after the defendants' assignments of error had been overruled. Thus, there can be no room for cavil as to the sufficiency of the defendants' (appellants') exceptions.

Since the instruction expressly admonished the jury that "you shall not award the plaintiffs any amount for any alleged injuries done to their persons

or reputations," we must believe that the verdict allowed nothing to the partnership for injury to either plaintiff individually. The instruction, as we have seen, limited recovery for injury "to their business, and to their business alone." We cannot infer that when the trial judge spoke those words he had in mind injury to the partnership by virtue of anything that happened to any tangible item of property which the partnership possessed. First, the complaint mentioned nothing of that kind. Next, the plaintiffs, in connection with the conduct of their business, employed in it only the following: (1) a space 10 by 12 feet in size, in the attic of the home of plaintiff John Marr, which they used as their shop; (2) repair tools and a few radio parts belonging to John, which he thought were worth possibly $350; and (3) a Ford coupe of an undisclosed age and value which the plaintiff Robert Marr used in picking up and delivering the radio sets of those who responded to the advertisement, "Ph. 9098." None of those items were acquired in order to launch this little business venture. The plaintiffs did not claim that their business, to which they had given no name, had won for itself any good will, let alone good will of a monetary value. In fact, no name was chosen for it and no assumed-name certificate was filed, according to Robert, until after the venture had ceased functioning and the plaintiffs had in contemplation the institution of this action. Hence, it is certain that the jury did not allow the $4,000 damages under a belief that any of the above items (attic space, tools, parts, automobile) were adversely affected by the defendants' publication.

The damages which were allowed must have been awarded under a belief that the plaintiffs had a profitable business when the defendants published their article

and that its capacity to continue to earn profits was destroyed. The following, being a photographic copy of all of the bookkeeping records of the partnership shows the entire volume of business which was transacted by the partnership from the day that the business began, November 21, 1946, until it ceased operations 51 days later, January 11, 1947.

The above bookkeeping entries account for every cent which the plaintiffs received from their business venture. It identifies every item of repair business which they handled—17 in number—and for which they were paid a total of $187.12. The latter was the gross amount; yet when the little venture, which had yielded only $187.12, folded its tents and quit, there emerged from it, Phoenix-like, a judgment against the defendants for $4,000.

The above entries include these three:

| "Net Profit | Nov. | $42.12" |
| "Net Profit | Dec. | $44.11" |
| "Net Profit | Jan. '47 | $12.45" |

The three total $98.68. Thus, in the 51 days in which the venture was in operation it brought to the plaintiffs a net profit of $98.68; provided the above in truth represents net profits. Assuming that the sum of $98.68 was, in fact, a net profit, the business earned $1.93 per day. Since the jury awarded $4,000, it must have assumed that the business would continue to earn $1.93 per day for a total of 2,072 days, or for approximately six years. No justifiable inference can be entertained that the plaintiffs would have expanded their business, for they had no plan for so doing, and expressed themselves as desiring nothing more than "a small limited" amount of repair work. They had

EXPENSES

| RECEIVED | | DATE | DESCRIPTION | PARTS COST | COMMISSIONS | ADVERTISING | AUTO EXPENSE | MISCELLANEOUS | RECEIVED | PAID OUT |
|---|---|---|---|---|---|---|---|---|---|---|

other sources of income and wanted to do no more than supplement it.

It will be noticed that the entries in the plaintiffs' books as reproduced above allowed nothing for such items as rent, light, heat, use of tools and automobile. Obviously, this case must be determined upon the principles of law that govern all other tort cases in which damages are sought upon charges of lost profits. Accordingly, before a juror could determine whether or not the plaintiffs had earned a profit in the 51 days they were in the radio repair business, some deductions must be made from gross income on account of the expense items just mentioned. The record discloses nothing concerning the amount of any one of them. Again, by reverting to the two sheets of bookkeeping items, it will be noticed that nothing was deducted as the cost of the advertisements which the plaintiffs had inserted in the Capital Journal.

When the plaintiffs instituted this action they, of course, assumed the burden of presenting evidence showing that they had a business which was earning a net profit. Let us now turn to the authorities.

The following is taken from *Blakiston v. Osgood Panel & Veneer Co.*, 173 Wash 435, 23 P2d 397:

"We are committed to the principle that before one can claim and recover future profits for the loss or injury to a business, it must be shown that the business was established and going and not a mere experiment, or new adventure. Schultz v. Wells Butchers' Supply Co., 151 Wash. 328, 275 P. 737. And, further, that the damages for loss of anticipated profits of a business, while recoverable in any proper case, must be shown with a reasonable degree of accuracy. Id.; Pearce v. Puget Sound Broadcasting Co., 170 Wash. 472, 16 P. 2d 843."

*Catarau v. Sunde & D'Evers Co.*, 188 Wash 592, 63 P2d 365, ruled:

> "In order to recover damages for loss of profits to a business, it must appear that the business has been in successful operation for such a period of time as to give it permanence and recognition. Webster v. Beau, 77 Wash. 444, 137 P. 1013, 51 L.R.A.(N.S.) 81; Andreopulos v. Peresteredes, 95 Wash. 282, 163 P. 770; Schultz v. Wells Butchers' Supply Co., 151 Wash. 382, 275 P. 737; Lockit Cap Co. v. Globe Manufacturing Co., 158 Wash. 183, 290 P. 813; Blakiston v. Osgood Panel & Veneer Co., 173 Wash. 435, 23 P.(2d) 397; Automatic Canteen Co. of Washington v. Automatic Canteen Co. of America, 182 Wash. 133, 45 P.(2d) 41; 17 C.J. 797, § 118.

> "There was nothing substantial upon which the court could submit the issue of the contemplated investment. That issue was, therefore, properly withdrawn from the jury."

The rule stated in those decisions is employed generally by the courts. For example, 53 CJS, Libel and Slander, § 242, p 365:

> "Following the general rule, it has been held that the correct measure of damages to the business is the diminution of the net income from the business."

The same principle is stated in this way in 15 Am Jur, Damages, § 155, p 571:

> "It may be stated as a general rule that in tort actions a recovery may be had for loss of profits, provided their loss is the proximate result of the defendant's wrong and they can be shown with reasonable certainty. The profits recoverable in such cases are limited to probable, as distinguished from possible, profits."

That rule is so familiar in this state that it is unneces-

sary to fortify its statement with citation to our decisions.

Yet, notwithstanding the rule given by the authorities from which I just quoted, and the fact that the evidence fails to establish any basis for a belief that the plaintiffs had a business which would probably return a profit for them in the days to come, a judgment was entered in their favor in the sum of $4,000.

This is not an instance in which the owners of a business are attempting to hold a purported wrong-doer liable for an alleged unjustifiable interference with a business device [such as a method of advertising] which in the past had brought to the business its customers. In recent years an ever-expanding number of decisions have developed the principles of law which govern cases in which it is claimed that another, through wrongful action, has interfered with the business' access to its customers. Many of those cases are cited and analyzed in Harper and James, The Law of Torts, ch 6. That treatise deduces from the decisions the governing principles of law. A study of that chapter indicates that in most instances the cases were not governed by the law of defamation. If we view the blind advertisements which the plaintiffs published in the two Salem newspapers as a business device which was intended to yield them a satisfactory number of customers, it will readily be seen that the decline in their business, after publication of the challenged article, could readily have occurred merely because people had become apprehensive of blind advertisements. I will presently go into that matter, but for the present rest upon the conclusion that before the plaintiffs were entitled to any recovery in this action it was incumbent upon them to present evidence showing that they had a business which was profitable.

Since no evidence of that character is in the record, the plaintiffs are not entitled to receive from the defendants $4,000 or any other sum. I am satisfied that the majority has disregarded reversible error.

I now proceed to the second ground for this dissent. The principle of law which underlies it is frequently employed by the courts. *Spain v. Oregon-Washington R. & N. Co.*, 78 Or 355, 153 P 470, ruled:

> "When the evidence leaves the case in such a situation that the jury will be required to speculate and guess which of several causes occasioned the injury, that part of the case should be withdrawn from their consideration."

Those words were quoted in and governed *Coston v. Portland Trust Co.*, 131 Or 71, 278 P 586, 282 P 442. See, also, *Lippold v. Kidd*, 126 Or 160, 269 P 210, 59 ALR 875, and *Wintersteen v. Semler*, 197 Or 601, 250 P2d 420, 255 P2d 138.

In *Ash v. Childs Dining Hall Co.*, 231 Mass 86, 120 NE 396, 4 ALR 1556, which has become almost a landmark in the law of torts, Mr. Chief Justice Rugg said:

> "There is nothing in the record from which it can be inferred that the harm to the plaintiff resulted directly from any failure of duty on the part of the defendant. The precise cause of her injury is left to conjecture. It may as reasonably be attributed to a condition for which no liability attaches to the defendant as to one for which it is responsible. Under such circumstances, the plaintiff does not sustain the burden of fastening tortious conduct on the defendant by a fair preponderance of all the evidence, and a verdict ought to be directed accordingly."

Prosser on Torts, p 222, states the rule in this way:

> "On the issue of the fact of causation, as on other issues essential to his case, the plaintiff has

the burden of proof. He must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant."

Section 285 of 38 Am Jur, Negligence, at page 976, says:

"In showing that the negligence charged was the proximate cause of the injury, it is not enough for the plaintiff to prove that the negligence might perhaps have caused the injury. If, for example, the injury complained of might well have resulted from one of many causes, it is incumbent upon the plaintiff to produce evidence which will exclude the operation of those causes for which defendant is under no legal obligation. If the cause of the injury to the plaintiff may be as reasonably attributed to an act for which the defendant is not liable as to one for which he is liable, the plaintiff has not sustained the burden of fastening tortious conduct upon the defendant."

This court has applied, in cases of libel, the rule that if the injury for which the plaintiff seeks damages may have resulted from some cause other than the purported defamation, the plaintiff cannot recover unless the evidence shows that the latter, rather than the other competing causes, was the more probable. *DeLashmitt v. Journal Publishing Co.*, 166 Or 650, 114 P2d 1018, 135 ALR 1175, and *Mannix v. Portland Telegram*, 144 Or 172, 23 P2d 138.

The instruction to the jury, quoted in a preceding paragraph, authorized the jury to include in its award "such amount of money as will justly compensate plaintiffs for damages, if any, done by the publication of

the article to their [plaintiffs'] business." Note must be taken of the fact that the instruction did not restrict the jury to compensation for injury which may have resulted from the defamation of the plaintiffs. Accordingly, as I have stated before, although the action at bar is based upon averments that the business was destroyed because the article defamed the plaintiffs, the instruction just quoted authorized the assessment against the defendants of all damages "done by the publication of the article to their business."

I will now take note of an additional fact which so far has not been mentioned. Before the alleged defamatory article was published, the advertisement quoted in the majority opinion had been run, not only upon the classified advertisement page of both of Salem's daily newspapers, but also upon another page of each where it appeared in a column which interspersed local news with brief advertisements, such as the plaintiffs'. Plaintiff John Marr testified:

"Q Now did you do any other advertising during that period along prior to the 4th of December?
"A We had another ad in the Capital Journal and the Statesman in the locals column."

His brother Robert, who gave similar testimony, explained the discontinuance of the advertisement in the locals column in this way:

"The reason we didn't stay there was because it was more expensive."

Upon the classified advertisement page the plaintiffs' advertisement appeared in a column, a page and a half in length, entitled "For Sale Miscellaneous."

Any or all of the following three circumstances may have accounted for the decline in the plaintiffs' business: (1) withdrawal of the advertisement from

the local news column; (2) knowledge on the part of some readers of the article that the plaintiffs were the radio repairmen who identified themselves as "Ph. 9098" and an ensuing belief upon their part that the plaintiffs were dishonest, with the result that they withheld their patronage from them; (3) radio owners who (a) had no knowledge whatever of the plaintiffs, (b) did not know the identity of the advertiser who identified himself as "Ph. 9098", and (c) did not know whether or not the article was true, but who felt that it was better not to answer blind advertisements.

The evidence fails to show that the second of the above reasons was more likely to have been the cause of the decline in the plaintiffs' business than either or both of the other two. That question, however, was left by the evidence in the realm of conjecture and guesswork. The fact that the plaintiffs did not take it out of that realm alone should suffice to warrant a holding that they failed to discharge the burden of proof. But, if we may resort to conjecture, the second of the above-listed reasons for the decline in the plaintiffs' business appears to have been the least likely of the three. Surely the repetition of the advertisement in the more expensive locals column had a greater drawing power than in the lengthy column of the classified advertisements page entitled "For Sale Miscellaneous."

There is still another reason for saying that the second of the above-listed possible causes for the decline in the plaintiffs' business was the least likely. The article was published December 4, 1946, and more than eleven years have passed since that day. In the interval, although the cause has been tried twice in the circuit court, not a single witness testified that he thought ill of either of the plaintiffs on account of the article. No one who knew them indicated that his

friendship for or confidence in the plaintiffs had been in any way impaired by the article. Likewise, no one indicated, that he withheld his business from them because of the article. Some of the plaintiffs' witnesses expressed concern for them on account of fears that the drawing power of the advertisement would be impaired. That fear, and not a belief that anyone would deem either of the plaintiffs a dishonest person, was the object of concern of their friends. In fact, the plaintiffs themselves entertained the same concern over their infant enterprise after they had read the defendants' article, as we see from the following account given by plaintiff Robert Marr of the call which he and his brother made upon the Journal reporter who wrote the article; he swore:

> "We told him [the reporter] we were afraid that it aimed at our ad and damaged our ad, and consequently would hurt the results we were getting from the ad, and asked him what could be done to identify us."

Thus we observe that, immediately after the article appeared, the apprehension which the plaintiffs experienced was that the article was "aimed at our ad and damaged our ad." No thought was voiced that anyone who read the article would deem the plaintiffs dishonest. A couple of years after leaving Willamette University, the plaintiff, John Marr, established in Salem a business under the name of Marr which is engaged in the repair and sale of radio and television sets. He stated that at the outset he located the business in the basement of a commercial structure, but that an expanding volume of business soon enabled him to move to the ground floor. Seemingly, the next step he took was to incorporate his business and in so doing he retained for it the name of Marr. It appears

from his testimony that before long he moved again, this time to a nearby superior structure. He also testified that another concern, located in a different part of Salem, has purchased some of the capital stock which he issued, and that the service cars of the two enterprises carry upon their sides both names. Accordingly, I repeat, the second of the three above-listed possible causes of the decline of the plaintiffs' volume of business seems the least likely of the three to qualify as proximate cause.

The business which was done under the designation of "Ph. 9098," it is true, came to an end, but that was not because anyone who knew the plaintiffs thought ill of them and withheld his business. One who is responsible for a libel which identifies an individual may properly be held liable under the rule of "libel per se," even though the defamed person may be unable to call to the witness stand anyone who thought ill of him. The reason for the rule consists in part in the fact that, years later, someone may encounter the writing and that then the damage will be done. Nothing of that kind is possible in this instance because the partnership which sought the damages has been ended and the business, which it is claimed was injured, quit operations years ago. Again, the article did not say that all repairmen who used blind advertisements were dishonest.

The drawing power of the business device upon which the plaintiffs depended to win for them patronage, that is, their unique little advertisement, succumbed possibly because of the publication of the article; but this is not an action of the type analyzed in Harper and James, ch 6, supra. In cases of that kind malice, in the form of unjustifiable purpose, must be established. In the present instance, the trial judge

ruled as a matter of law that no evidence of malice was presented. Confusion in the law will ensue if we attempt to jam this case into the form of an action for defamation. It must be clear that the plaintiffs were not defamed; or, if someone feels that defamation must be presumed, then it is clear that the wrong rule for the measurement of damages was given to the jury. The plaintiffs did not discharge the burden of proof which they undertook when they instituted this action. They have not shown that their business was lost to them through defamation. The motion for a directed verdict should have been sustained. Error was committed when it was denied.

I dissent for the above reasons.